**No. 23-35538**

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

L.B.,
Plaintiff-Appellant,
v.
UNITED STATES OF AMERICA,
Defendant-Appellee,

---

On Appeal from the United States District Court for the District of Montana
No. 1:18-cv-00074-SPW

---

## BRIEF OF *AMICI CURIAE* AMERICAN CIVIL LIBERTIES UNION, ACLU OF MONTANA FOUNDATION, INC., ACLU OF ARIZONA, ACLU OF HAWAIʻI, ACLU OF NEVADA, ACLU OF NORTHERN CALIFORNIA, ACLU OF OREGON, ACLU OF ALASKA, AND ACLU OF WASHINGTON IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL

---

Alex H. Rate
Marthe Y. VanSickle
ACLU of Montana Foundation, Inc.
P.O. Box 1968
Missoula, MT 59806
ratea@aclumontana.org
vansicklem@aclumontana.org

Jeffrey L. Braun
Danielle Moody*
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
jbraun@kramerlevin.com
dmoody@kramerlevin.com

Chloe Bootstaylor
Kramer Levin Naftalis & Frankel LLP
2000 K Street NW, 4th Floor
Washington, DC 20006
cbootstaylor@kramerlevin.com

*Counsel for Amici Curiae*

* Application for admission pending

Linda S. Morris*
ACLU Women's Rights Project
125 Broad Street
New York, NY 10004
LindaM1@aclu.org

Crystal Pardue*
Rachel Meeropol
ACLU Racial Justice Program
125 Broad Street
New York, NY 10004
cpardue@aclu.org
rmeeropol@aclu.org

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................ iv

CORPORATE DISCLOSURE STATEMENT ........................................1

INTEREST OF *AMICI CURIAE* ............................................................1

INTRODUCTION ...................................................................................2

PRIOR PROCEEDINGS ........................................................................6

ARGUMENT ...........................................................................................8

    A.    Under Montana Law, Bullcoming Acted Within the Scope of His Employment When He Abused His Law Enforcement Authority to Commit Sexual Assault .....................................................8

    B.    Vicarious Liability When Police Officers Abuse Their Authority to Commit Sexual Assault Will Improve Law Enforcement Accountability on Indian Reservations ........................14

        1.    Police sexual misconduct is enabled by the nature and culture of police work .............................................................14

        2.    The U.S. government has neglected the rampant victimization of Indigenous women in Montana .....................20

        3.    Imposing vicarious liability on law enforcement agencies whose officers commit sexual assault will foster institutional accountability.........................................................26

CONCLUSION .......................................................................................29

iii

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Brenden v. City of Billings*,
   470 P.3d 168 (Mont. 2020)............................................................*passim*

*Graham v. Connor*,
   490 U.S. 386 (1989)............................................................................16

*Haaland v. Brackeen*,
   599 U.S. 255 (2023) (Gorsuch, J., concurring) ...............................21

*Keller v. Safeway Stores, Inc.*,
   108 P.2d 605 (Mont. 1940) ..............................................................10

*L.B. v. United States*,
   2019 WL 5298725 (D. Mont. July 16, 2019) ......................................6

*L.B. v. United States*,
   2023 WL 5036852 (D. Mont. Aug. 8, 2023).....................9, 10, 13, 14

*L.B. v. United States*,
   49 F.4th 1241 (9th Cir. 2022) .............................................................7

*L.B. v. United States*,
   515 P.3d 818 (Mont. 2022)..........................................................*passim*

*L.B. v. United States*,
   8 F.4th 868 (9th Cir. 2021) .............................................4, 6, 10, 19

*Michigan v. Bay Mills Indian Cmty.*,
   572 U.S. 782 (2014)..........................................................................21

*Northern Cheyenne Tribe v. United States*,
   No. 20-cv-183-BLG-SPW (D. Mont. Dec. 15, 2020) .......................24

*Policemen's Benevolent Association of New Jersey, Local 318 v.
Township of Washington*,
   850 F.2d 133 (3d Cir. 1988) .............................................................16

*Seminole Nation v. United States*,
    316 U.S. 286 (1942) ........................................................................20, 21

*Tennessee v. Garner*,
    471 U.S. 1 (1985) ...................................................................................16

*Trottier v. United States*,
    No. 21-CV-93, 2021 WL 5237287 (D.N.D. Nov. 10, 2021) .............................25

*United States v. Mitchell*,
    463 U.S. 206 (1983) ...............................................................................21

**Statutes**

18 U.S.C. § 242 ...........................................................................................14

28 U.S.C. § 1346 .............................................................................4, 6, 14, 19

MCA § 45-5-501 ..........................................................................................26

Mont. Laws 2019, ch. 133, § 1 .........................................................................5

**Other Authorities**

*About IACP*, https://www.theiacp.org/about-iacp ...........................................18, 27

*Addressing Sexual Offenses and Misconduct by Law Enforcement:*
    *Executive Guide,* International Association of Chiefs of Police,
    June 2011 ("IACP"),
    https://www.theiacp.org/sites/default/files/all/a/AddressingSexual
    OffensesandMisconductbyLawEnforcementExecutiveGuide.pdf ....................17

Andrea J. Ritchie, *How Some Cops Use the Badge to Commit Sex
    Crimes*, Washington Post, Jan. 12, 2018,
    https://www.washingtonpost.com/outlook/how-some-cops-use-the-
    badge-to-commit-sex-crimes/2018/01/11/5606fb26-eff3-11e7-
    b390-a36dc3fa2842_story.html .......................................................15

*Annual Claims Report Fiscal Year 2022* 29 (April 14, 2023),
    https://comptroller.nyc.gov/wp-
    content/uploads/documents/Annual-Claims-Report-FY2022.pdf.....................30

Cara E. Trombadore, *Police Officer Sexual Misconduct: An Urgent Call to Action In a Context Disproportionately Threatening Women of Color*, 32 Harv. J. Racial & Ethnic Just. 153 (2016) ........................27

Kathy Dobie, *Tiny Little Laws: A Plague of Sexual Violence in Indian Country,* Harpers Mag.. (Feb. 2011), https://harpers.org/archive/2011/02/tiny-little-laws/ ....................................24, 25

Laura Sullivan, *Rape Cases on Indian Lands Go Uninvestigated*, NPR (July 25, 2007), https://www.npr.org/templates/story/story.php?storyId=12203114..................24

*Lesbian, Gay, Bisexual, Transgender, Questioning, (LGBTQ), and Two-Spirit Health*, Indian Health Serv., https://www.ihs.gov/lgbt/healtgh/twospirit/ .........................................................3

Martha Chamallas, *Vicarious Liability in Torts: The Sex Exception*, 48 Val.. U. L. Rev. 133 (2013) ...................................................................................18

Matt Sedensky & Nomaan Merchant, *Hundreds of Officers Lose Licenses Over Sex Misconduct*, Associated Press (Nov. 1, 2015), https://apnews.com/article/oklahoma-police-archive-oklahoma-city-fd1d4d05e561462a85abe50e7eaed4ec.........................................................15

Michael S. Vaughn, Tab W. Cooper, Rolando V. del Carmen, *Assessing Legal Liabilities in Law Enforcement: Police Chiefs' Views*, 47 Crime & Delinquency 3 (2001) .........................................................28

*National Police Misconduct Reporting Project 2010 Annual Report*, Cato Inst., https://www.leg.state.nv.us/Session/77th2013/Exhibits/Assembly/JUD/AJUD338L.pdf...............................................................................................15

Nirej Sekhon, *Police and the Limit of Law*, 119 Colum. L. Rev. 1711 (2019)........................................................................................................................16

Philip M. Stinson, John Liederbach, Steven L. Brewer, Brooke E. Mathna, *Police Sexual Misconduct: A National Scale Study of Arrested Officers*, Crim. Just. Fac. Publ'n (2014)................................................17

vi

Philip M. Stinson, Sr., John Liederbach, Steven P. Lab, & Steven L.
    Brewer, Jr., *Police Integrity Lost: A Study of Law Enforcement
    Officers Arrested* (Apr. 2016),
    https://www.ojp.gov/pdffiles1/nij/grants/249850.pdf ........................................15

Phillip M. Stinson, Robert W. Taylor, John Liederbach*, The
    Situational Context of Police Sexual Violence: Data and Policy
    Implication*, Fam Intim Partn. Violence Q. (2020)............................................17

Rachel E. Morgan & Grace Kena, U.S. Dep't of Just. Bulletin,
    *Criminal Victimization, 2016: Revised* 7 (2018)
    https://bjs.ojp.gov/content/pub/pdf/cv16.pdf....................................................25

Restatement (Second) of Agency § 229 ................................................................12

*Reviewing the Trump Administration's Approach to the Missing and
    Murdered Indigenous Women* (*MMIW*) *Crisis* 15, H'g Before
    Subcomm. For Indigenous Peoples of the United States, H. Comm.
    On Natural Resources, 116th Cong., 1st Sess. (Sept. 11, 2019),
    https://www.congress.gov/116/chrg/CHRG-116hhrg37680/CHRG-
    116hhrg37680.pdf........................................................................................23

Sam Wilson, *Families, Investigators Struggle to Track Down Missing
    Native Women*, Billings Gazette (Feb. 25, 2019),
    https://billingsgazette.com/news/state-and-
    regional/mmiw/families-investigators-struggle-to-track-down-
    missing-native-women/article_3fee49c9-913a-593d-96e3-
    14d03a781caa.html ......................................................................................23

Scott Calvert & Dan Frosch*, Police Rethink Policies as Cities Pay
    Millions to Settle Misconduct Claims*, Wall Street Journal (Oct. 22,
    2020), https://www.wsj.com/articles/police-rethink-policies-as-
    cities-pay-millions-to-settle-misconduct-claims-11603368002........................29

Senate Judiciary Committee hearing on SB 261, 2019 Leg., 66th Sess.
    (Feb. 21, 2019), http://sg001-
    harmony.sliq.net/00309/Harmony/en/PowerBrowser/PowerBrowse
    rV2/20190221/-1/33819.................................................................................26

Timothy M. Maher, *Police Chiefs' Views on Police Sexual Misconduct*, 9 Police Prac. & Res. 239 (2008)....................................27

Timothy M. Maher*, Police Sexual Misconduct: Officers' Perceptions of Its Extent and Causality*, 28 Crim. Just. Rev. 355 (2003).......................17, 28

U.S. Dep't of Interior, Indian Affairs, *Frequently Asked Questions*, https://www.bia.gov/frequently-asked-questions ...............................21

U.S. Dep't of Interior, Indian Affairs, *Missing and Murdered Indigenous People Crisis: Violence Against Native Americans and Alaska Natives far Exceed National Averages*, https://www.bia.gov/service/mmu/missing-and-murdered-indigenous-people-crisis ...................................................................23

U.S. Dep't of Interior, Indian Affairs, *Office of Justice Services*, https://www.bia.gov/bia/ojs ..............................................................22

U.S. Dep't of Interior, Work Place Environment Study Reports, *Topline Results*, https://www.doi.gov/sites/doi.gov/files/uploads/doi_wes_topline_results_summary.pdf ..................................................................26

U.S. Dep't of Just., The Attorney General Guidelines for Victim and Witness Assistance 37 (2022), https://www.justice.gov/media/1254671/dl?inline ...........................22

U.S. Dep't of Just., *Indian Country Investigations and Prosecutions* 18 (2021), https://www.justice.gov/d9/2023-08/2021_-_indian_country_investigations_and_prosecutions_report.pdf........................22

U.S. Dep't of Just., Nat'l Inst. of Just., *"Broken Windows" and Police Discretion* (Oct. 1999), https://www.ojp.gov/pdffiles1/nij/178259.pdf ..................................16

U.S. Dep't of Just., Nat'l Inst. of Just., *Violence Against American Indian and Alaska Native Women and Men* 1 (May 2023), https://www.ojp.gov/pdffiles1/nij/249815.pdf ..................................23

U.S. Dep't of Just., Office on Violence Against Women, 2017 Tribal
     Consultation Report 74 (Oct. 2017),
     https://www.justice.gov/ovw/file/1046426/download.........................................25

U.S. Dep't of Just., Office of Violence Against Women, *2016 Tribal
     Consultation Report* 62 (Dec. 2016),
     https://www.justice.gov/ovw/page/file/953291/download................................24

U.S. Gov't Accountability Office, GAO-11-167R, *U.S. Department of
     Justice Declinations of Indian Country Criminal Matters* 9 (Dec.
     2010), https://www.gao.gov/assets/gao-11-167r.pdf.........................................24

Violence Against Women and Dep't of Justice Reauthorization Act. of
     2005, Pub. L. No. 109-162, § 901, 119 Stat. 2960 (2006) ................................21

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici curiae* state that they are non-profit organizations, with no parent corporation or publicly traded stock, and no publicly held company has 10% or greater ownership in *amici*.

# INTEREST OF *AMICI CURIAE*[1]

The American Civil Liberties Union ("ACLU"), the ACLU of Montana Foundation, Inc. ("ACLU-MT"), the ACLU of Arizona ("ACLU-AZ"), the ACLU of Hawaiʻi ("ACLU-HI"), the ACLU of Nevada ("ACLU-NV"), the ACLU of Northern California ("ACLU-NorCal"), the ACLU of Oregon ("ACLU-OR"), the ACLU of Alaska ("ACLU-AK"), and the ACLU of Washington ("ACLU-WA") respectfully submit this brief, with the consent of all parties, as *amici curiae* in support of the appeal by plaintiff-appellant, L.B., from the August 8, 2023 order of the U.S. District Court for Montana.  The ACLU is a nationwide, non-profit, nonpartisan organization whose mission is to support and protect civil rights and liberties.  The ACLU-MT, the ACLU-AZ, the ACLU-HI, the ACLU-NV, the ACLU-NorCal, the ACLU-OR, the ACLU-AK, and the ACLU-WA are affiliates of the ACLU located in Montana, Arizona, Hawaiʻi, Nevada, Northern California, Oregon, Alaska, and Washington, respectively.  These ACLU affiliates regularly appear as *amici* before this Court.  *Amici* believe that their experience advocating for the rights of Indigenous people, people whose constitutional rights have been

---

[1] No party or party's counsel authored this brief or contributed money to fund the preparation or submission of this brief. No person other than *amici*, their members, and their counsel contributed money to fund the preparation or submission of this brief.

violated by law enforcement officers, and all victims and survivors of gender-based violence will assist the Court in reaching a just decision in this case.

## INTRODUCTION

Officer Bullcoming's sexual assault of L.B. is illustrative of longstanding patterns of law enforcement abuse of Indigenous women on Indian reservations. L.B., a Northern Cheyenne woman, contacted the police because of a concern about her mother's safety. Dana Bullcoming, a Bureau of Indian Affairs ("BIA") officer, responded to the call. While in uniform and on duty, he entered L.B.'s home on the Northern Cheyenne Reservation and asked L.B. investigatory questions about her alcohol consumption. Exercising his law enforcement authority, Bullcoming directed L.B. to his police cruiser, where he used his police-issued breathalyzer to test her blood alcohol content. He threatened to call social services and arrest her for intoxication in the presence of children. He then told L.B., who was fearful of jail and losing her children and her job if she was arrested, that "something had to be done" to address her alleged violation of law, quickly making clear that he meant sex. Bullcoming then raped L.B.

The critical question before the district court, and on appeal before this Court, is whether Bullcoming acted within the scope of his employment when he used his law enforcement authority and power as an on-duty officer to sexually assault a member of the public. The answer should be: Yes.

- 2 -

That answer is critical for Indigenous women like L.B. Sexual assault, human trafficking, and other forms of violence have reached crisis levels on Indian reservations. Federal law enforcement often is unresponsive to tribal needs, open cases languish, and offenders exploit gaps to prey on Indigenous women, girls, and Two-Spirit people.[2] When federal officers themselves are the perpetrators, it exacerbates these vulnerabilities, makes justice for survivors even more unlikely, and discourages tribal members from reporting crimes or seeking assistance from law enforcement. The imposition of vicarious civil liability on the officer's employer, the U.S. government, would contribute substantially to curbing this widespread abuse.

Federal law places Native Americans on reservations at a potential disadvantage when they seek a civil remedy. Although Montana has joined many other states in adopting the nondelegable duty doctrine, claims against federal agencies, which exercise primary responsibility for policing on the Northern Cheyenne Reservation—and indeed on most reservations across the United States—must rest on scope-of-employment liability. *See* 28 U.S.C. § 1346(b)(1). This distinction means that the rape victim of a local sheriff's employee has a remedy in

---

[2] "Two-Spirit" is a gender found in many Indigenous cultures, which is not exclusively male or female. *See Lesbian, Gay, Bisexual, Transgender, Questioning, (LGBTQ), and Two-Spirit Health*, Indian Health Serv., https://www.ihs.gov/lgbt /health/twospirit/.

tort against the employer under the nondelegable duty doctrine, but the rape victim of a BIA officer may not rely on that doctrine because of the rapist's status as a federal employee. As this Court recognized, "[t]his dichotomy . . . has a disproportionate effect on Montana's indigenous population, who are more likely to interact with federal, rather than state or local, law-enforcement officers." *L.B. v. United States*, 8 F.4th 868, 871 (9th Cir. 2021).

By holding that Bullcoming acted within the scope of his employment when he used his law enforcement authority and power to sexually assault L.B., this Court can level that disproportionate impact, ensure accountability by federal law enforcement agencies, and incentivize them to effect systemic changes. Civil accountability for such violence committed by federal law enforcement would also support tribal members in seeking emergency assistance when needed. Fear of sexual assault and other abuse by law enforcement is a key reason why tribal members avoid contact with law enforcement in the first place.

Montana law supports vicarious liability when police officers abuse their law enforcement authority and power to sexually assault civilians. *L.B. v. United States*, 515 P.3d 818 (Mont. 2022). As set forth in *Brenden v. City of Billings*, 470 P.3d 168 (Mont. 2020), Bullcoming's sexual assault of L.B. was "within the scope of employment if the act was [1] incidental to the performance of an expressly or implicitly authorized act and [2] at least partially motivated by [Bullcoming's] intent

or purpose to serve the employer's interest." *Id.* at 174. Here, the district court found that Bullcoming's sexual assault was incidental to the performance of an authorized act. However, in determining whether the assault satisfied the second prong, the district court erroneously treated as dispositive Bullcoming's "subjective belief" as to whether he was furthering the BIA's interests. *Id.* at 175. In doing so, the district court failed to consider the totality of the circumstances, as required under *Brenden*, and the many ways in which Bullcoming's conduct "was predicated upon and incident to his employment as a BIA officer." *See L.B.*, 515 P.3d at 826.

Here, every step Bullcoming himself took to coerce L.B. was predicated upon and in service to a law enforcement function and purpose. Indeed, in stating that "something had to be done," Bullcoming characterized the sexual assault as a consequence of L.B.'s alleged violation of the law—i.e., an act of law enforcement. Montana courts routinely hold other types of assaults by law enforcement officers to be within the scope of their employment, and it makes no sense to treat sexual assaults differently, particularly in light of the Montana Legislature's recent recognition—in part because of this very case—that the inherent power imbalance between law enforcement and civilians precludes valid consent in police encounters. *See* Mont. Laws 2019, ch. 133, § 1. Furthermore, to the extent that the district court's decision can be read as holding that an officer's subjective belief is the dispositive factor in determining whether they acted in the scope of their employment, or that

employers *cannot* be held liable when employees act with a dual or mixed motive, it should be overruled.

## PRIOR PROCEEDINGS

In 2018, L.B. commenced this action against the United States, the BIA, and Bullcoming under the Federal Tort Claims Act ("FTCA"). The statute imposes vicarious liability on the United States for the actions of an employee only if, under the law of the place in which the events occurred, a private employer would be liable under principles of *respondeat superior*.[3] Following entry of a $1.61 million default judgment against Bullcoming (which remains entirely unsatisfied), the district court granted summary judgment to the U.S. government, holding that Bullcoming's actions were entirely outside the scope of his employment. *See L.B. v. United States*, 2019 WL 5298725, at *7 (D. Mont. July 16, 2019).

L.B. appealed to this Court, which referred the case to the Montana Supreme Court for clarification of an issue of Montana's law of *respondeat superior*. *L.B. v. United States*, 8 F.4th 868 (9th Cir. 2021). The Montana Supreme Court accepted the certification but reformulated the certified question as:

> Under Montana law, do law-enforcement officers act outside the scope of their employment, as a matter of law, when they use

---

[3] The application of Montana state law in this brief should not be construed as an agreement that state law, rather than tribal law, is the appropriate "law of the place" for FTCA claims arising on tribal land.

their authority as on-duty officers to sexually assault a person they are investigating for a crime?

*L.B.*, 515 P.3d at 821. The Montana Supreme Court answered this reformulated question with a resounding "No." The Court's opinion thoroughly analyzed the law and the facts of this case. This Court then reversed the district court and remanded the case for further proceedings. *L.B. v. United States,* 49 F.4th 1241 (9th Cir. 2022).

On remand, the parties engaged in discovery. On December 14, 2022, with a December 30, 2022 discovery cut-off deadline looming, the U.S. government produced Bullcoming—who was no longer in prison but still on supervised probation—for a deposition. After an AUSA assured Bullcoming on the record that the U.S. government had no interest in investigating or pursuing a criminal case against him, Bullcoming gave testimony that directly contradicted in multiple material respects the testimony that he previously had provided at his allocution on entry of his guilty plea in the prior criminal case. Stunned by Bullcoming's about-face, L.B.'s attorneys immediately filed an emergency motion to extend the discovery deadline and for leave to take additional discovery. The U.S. government opposed the motion and moved for summary judgment, after which L.B. made a cross-motion for summary judgment.

At an April 15, 2023 hearing on all the motions, the district court denied L.B.'s discovery-related motion in its entirety without explanation. On August 8, 2023, the

district court issued an order granting summary judgment in favor of the U.S. government and denying L.B.'s cross-motion for summary judgment. This appeal followed.

## ARGUMENT

A. **Under Montana Law, Bullcoming Acted Within the Scope of His Employment When He Abused His Law Enforcement Authority to Commit Sexual Assault**

The Montana Supreme Court enunciated the governing legal standard in this case, holding that law enforcement officers can be determined to have acted within the scope of their employment when they use their law enforcement authority to sexually assault members of the public. *L.B. v. United States*, 515 P.3d 818 (Mont. 2022). That is precisely what happened here.

A tortious act occurs within the scope of employment "if the act was either expressly or implicitly authorized by the employer or was incidental to an expressly or implicitly authorized act." *L.B.*, 515 P.3d at 822 (citing *Brenden*, 470 P.3d at 173). An unauthorized act—including "if an on-duty police officer obtains consent by misusing official authority"—may nonetheless be within the scope of employment if the act "[1] arose out of the employment and [2] was at least partially motivated by an intent or purpose to serve the interests of his employer." *Id.* at 825 (citing *Brenden*, 470 P.3d at 173-74). As the district court found, "[i]t is beyond dispute that the assault arose out of Bullcoming's employment with the BIA"—and

therefore satisfies the first prong of the relevant legal standard. *L.B. v. United States*, 2023 WL 5036852, at *5 (D. Mont. Aug. 8, 2023). However, the district court wrongly concluded that the assault failed to satisfy the second prong based solely on Bullcoming's testimony, rather than considering the totality of circumstances as required by Montana state law. *See id.*

Under Montana state law, courts must consider the totality of circumstances in determining whether Bullcoming was at least partially motivated by an intent or purpose to serve the interests of the BIA. *Brenden*, 470 P.3d at 175 ("The question of whether an employee was at least partially motivated by an intent or purpose to directly or indirectly further the employer's interest is a question of fact for consideration under the totality of the circumstances."). The Montana Supreme Court has recognized that employers may be liable even where employees act with a dual or mixed motive. *Id.* at 174; *see also L.B.*, 515 P.3d at 825-26. Critically, "[t]he fact that an employee's predominant motive was self-interest *does not* preclude an act from the scope of employment if the employee was motivated by any purpose or intent to serve the employer's interest 'to *any appreciable extent*.'" *Brenden,* 470 P.3d at 174 (quoting Restatement (Second) of Agency § 236 cmt. b) (emphasis added); *see also Keller v. Safeway Stores, Inc.*, 108 P.2d 605, 611 (Mont. 1940) (personal motive does not take the act outside the scope of employment "unless it *clearly* appear[s] that the [employee] could not have been directly or

indirectly serving his [employer]") (citing Restatement of the Law of Agency § 236) (emphasis added).

Rather than considering the totality of the circumstances as required by Montana state law, the district court improperly limited its analysis to a "subjective belief" test and relied solely on Bullcoming's deposition testimony that he assaulted L.B. to serve his personal interests.[4] *L.B.*, 2023 WL 5036852, at *5. In doing so, the district court failed to consider the many facts that the Montana Supreme Court highlighted as specifically relevant to the second prong of the scope-of-employment analysis—that Bullcoming "was on-duty and was dispatched to investigate" alleged criminal activity, entered L.B.'s home and questioned her by virtue of his status as a BIA officer wielding his employer-conferred power and authority, investigated L.B.'s conduct by taking her to his patrol car and administering a BIA-owned breathalyzer test, accused L.B. of violating a law he was empowered to enforce,

---

[4] In fact, the district court misstated the relevant standard under Montana state law, holding that "Bullcoming's assault must have been at least incidental to the performance of an official act and at least partially motivated *by his subjective belief that he was furthering* his employer's interests." *L.B.*, 2023 WL 5036852, at *5 (emphasis added). This is not the relevant standard set forth by the Montana Supreme Court in *L.B.* or *Brenden*. *See L.B.*, 515 P.3d at 825 ("[T]he wrongful act may be within the scope of employment if it arose out of the employment and was at least partially motivated *by an intent or purpose to serve* the interests of his employer."); *Brenden*, 470 P.3d at 175 ("The question of whether an employee was at least partially motivated *by an intent or purpose to directly or indirectly further* the employer's interest is a question of fact for consideration under the totality of the circumstances.").

threatened her with arrest and removal of her children, and invoked his employer-conferred law enforcement authority and police discretion to sexually assault L.B. *See L.B.*, 515 P.3d at 825. Indeed, in his own words—i.e., that "something had to be done," Bullcoming characterized the sexual assault as a consequence of his investigation and, therefore, an act of law enforcement. All of the acts leading to the sexual assault were consistent with, and inextricable from, conduct by a police officer acting in furtherance of his law enforcement duties and purpose.

Notably, the Montana Supreme Court emphasized that BIA officers "have significant police discretion to enforce certain laws and to let civilians off with a warning," which "benefits the law enforcement agency and ultimately the taxpayers by keeping certain violations out of the criminal justice system and freeing up government resources." *Id.* at 825-26. The Montana Supreme Court further reasoned that "when an officer intimidates a civilian through . . . the use-of-force or the threat of force, he provides a benefit to his employer by maintaining law and order in the community." *Id.* at 826. This reasoning applies with equal force here.

There is no basis for focusing solely on the offending employee's subjective intent in the Montana Supreme Court's decision in this case,[5] or in § 229 of the

---

[5] In fact, as seen in this case, officers in Bullcoming's situation often have an incentive to testify that they did not have a subjective belief that they were furthering their employer's interest. Here, after an AUSA assured Bullcoming on the record that the U.S. government had no interest in investigating or pursuing a criminal case

Restatement (Second) of Agency, which the Montana court "adopt[ed] . . . in its entirety" for the "factors to determine whether conduct, although not authorized, may be similar or incidental to the conduct authorized thus making it within the scope of employment." *L.B.*, 515 P.3d at 824. Moreover, in holding that Bullcoming did not act in the scope of employment based solely on Bullcoming's subjective belief, the district court also failed to address the Montana Supreme Court's recognition that employers may be liable even where employees act with a dual or mixed motive and "[t]he fact that an employee's predominant motive was self-interest *does not* preclude an act from the scope of employment." *Brenden,* 470 P.3d at 174.

Indeed, based on the district court's own findings, L.B. is entitled to summary judgment against the United States because these facts satisfy Montana's two-prong *respondeat superior* analysis. The district court found, on the basis of the evidentiary record before it, that Bullcoming "showed up to L.B.'s house in response to a dispatch call and it was through his authority under the BIA that he coerced L.B. into sex." *L.B.*, 2023 WL 5036852, at *5. The facts that Bullcoming "showed up to L.B.'s house in response to a dispatch call" and "it was through his authority under

---

against him, Bullcoming gave testimony about his "subjective belief" that directly contradicted his own prior testimony. *See supra* 7.

the BIA that he coerced L.B. into sex" demonstrate that Bullcoming's actions were at least partially, if not entirely, in service of his law enforcement duties and purpose.

By ignoring the many facts in the record that Bullcoming was serving the interests of the BIA—including his own characterization of the assault as a consequence of his investigation of L.B.—the district court set an unfairly difficult standard. If *any* evidence that an officer is serving their own personal interest is sufficient to defeat a finding that they were acting within the scope of employment, then, in order for a plaintiff to prevail, *all* of the evidence would have to demonstrate that the officer was motivated *solely* by the interests of the employer when committing misconduct. In addition to being at odds with Montana state law recognizing that an employee's conduct may be in the scope of employment even if they act with a mixed motive, *see L.B.*, 515 P.3d at 825-26, it is difficult to imagine circumstances where this would be true. The district court's decision—which significantly limits the possibility of showing that an officer may act within the scope of employment when they sexually assault a person they are investigating for a crime—cannot be reconciled with the Montana Supreme Court's determination to the contrary. If allowed to stand, the decision would impose unreasonable and unjust barriers for sexual violence survivors seeking relief under the FTCA.[6]

---

[6] The Montana Supreme Court pointed out that, to determine whether an employee's misconduct was within the scope of his employment, it is essential that "the wrongful 'act' referred to . . . be accurately identified." *L.B.*, 515 P.3d at 824. The Court went

**B.  Vicarious Liability When Police Officers Abuse Their Authority to Commit Sexual Assault Will Improve Law Enforcement Accountability on Indian Reservations**

1.  <u>Police sexual misconduct is enabled by the nature and culture of police work</u>

Although police sexual violence is grossly underreported and understudied, existing data reveals that police sexual violence is a widespread and systemic problem across the country.  Sexual misconduct is the second-most-frequently reported form of police misconduct, after excessive force, and a police officer is reported for sexual misconduct at least every five days.[7]  One nationwide study

---

on to explain that the relevant act was not Bullcoming's sexual activity, but the abuse of his position to coerce L.B. into performing sexual acts:

> Here, the "act" Officer Bullcoming committed was not sexual intercourse without consent—L.B. agreed to have sexual intercourse with Officer Bullcoming in return for not being charged.  The unauthorized "act" Officer Bullcoming committed and for which he subsequently pleaded guilty was a violation of 18 U.S.C. § 242; that is, "under color of law, statute, ordinance, regulation, or custom, Officer Bullcoming willfully subjected L.B. . . . to the deprivation of her rights."

*Id.* (cleaned up).  In disregard of the Montana Supreme Court's ruling, however, the district court focused only on Bullcoming's sexual assault—improperly isolating that act from Bullcoming's abuse of law enforcement authority and police discretion in committing the assault.  *See L.B.*, 2023 WL 5036852, at *5.

[7] *National Police Misconduct Reporting Project 2010 Annual Report*, Cato Inst., https://www.leg.state.nv.us/Session/77th2013/Exhibits/Assembly/JUD/AJUD338L.pdf; *see also* Andrea J. Ritchie, *How Some Cops Use the Badge to Commit Sex Crimes*, Washington Post, Jan. 12, 2018, https://www.washingtonpost.com/outlook/how-some-cops-use-the-badge-to-commit-sex-crimes/2018/01/11/5606fb26-eff3-11e7-b390-a36dc3fa2842_story.html.

found that 1,070 officers were arrested for sex-related crimes in a seven-year period.[8]  Of this group, 416 were arrested for forcible rape or forcible sodomy, and another 352 were arrested for forcible fondling.[9]  Consistent with this figure, an investigation by the Associated Press uncovered nearly 1,000 officers who lost their law enforcement licenses in a six-year period for sex-related offenses.[10]

The staggering rates of police sexual violence are largely enabled by the nature and culture of policing.  Perhaps the most salient feature of policing that facilitates police sexual violence is the enormous "power and authority" that officers have over others.  Police are, after all, "sovereigns of the street,"[11] and exercise the "most awesome and dangerous power that a democratic state possesses with respect to its residents—the power to use lawful force to arrest and detain them," *Policemen's Benevolent Association of New Jersey, Local 318 v. Township of Washington*, 850 F.2d 133, 141 (3d Cir. 1988).  At any given moment, officers are

---

[8] Philip M. Stinson, Sr., John Liederbach, Steven P. Lab, & Steven L. Brewer, Jr., *Police Integrity Lost:  A Study of Law Enforcement Officers Arrested*, 104 (Apr. 2016), https://www.ojp.gov/pdffiles1/nij/grants/249850.pdf.

[9] *Id.* at 106.

[10] Matt Sedensky & Nomaan Merchant, *Hundreds of Officers Lose Licenses Over Sex Misconduct*, Associated Press (Nov. 1, 2015), https://apnews.com/article/oklahoma-police-archive-oklahoma-city-fd1d4d05e561462a85abe50e7eaed4ec.

[11] Nirej Sekhon, *Police and the Limit of Law*, 119 Colum. L. Rev. 1711, 1719 (2019).

entitled to stop large swaths of the population for some offense.[12]  Moreover, as the Supreme Court has recognized, officers' right to "make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Graham v. Connor*, 490 U.S. 386, 396 (1989); *see also Tennessee v. Garner*, 471 U.S. 1 (1985) (setting out test for constitutionally permissible use of deadly force).  The Montana Supreme Court explicitly recognized these considerations in its decision in this case.  *L.B.*, 515 P.3d at 825.

As discussed *infra*, law enforcement officers also have significant discretion to enforce certain laws, and to let civilians off with a warning.  *See also id.* at 825-26.  This discretion benefits law enforcement agencies by keeping certain violations out of the criminal legal system and freeing up government resources for enforcing and maintaining law and order in the community.  *Id.*  As a result, actions that flow from an officer's exercise of employer-conferred discretion are inseparable from furthering the interest of the law enforcement agency.  In pursuit of serving the law enforcement agencies' interest, officers may take advantage of their employer-conferred power, creating disastrous consequences.  For example, studies examining police misconduct have found many instances where officers used the pretext of

---

[12] U.S. Dep't of Just., Nat'l Inst. of Just., *"Broken Windows" and Police Discretion* (Oct. 1999), https://www.ojp.gov/pdffiles1/nij/178259.pdf.

alleged violation of a law to sexually harass or abuse women.[13] One 2014 report looked at nearly 550 cases across the country of officers arrested during a three-year period and found numerous cases of forcible or statutory rape, forcible sodomy, aggravated and simple assaults, and sexual assault with an object.[14] According to the same study, officers tended to be on-duty when they committed sexual violence. In fact, the International Association of Chiefs of Police has acknowledged that the policing profession "may inadvertently create opportunities for sexual misconduct" because of the "power and authority" that officers possess over others.[15] It has further explained that other aspects of policing also contribute to the problem; namely, the frequency with which officers "work independently," "function without

---

[13] *See* Phillip M. Stinson, Robert W. Taylor, John Liederbach*, The Situational Context of Police Sexual Violence: Data and Policy Implication*, Fam Intim Partn Violence Q. (2020); Timothy M. Maher*, Police Sexual Misconduct: Officers' Perceptions of Its Extent and Causality*, 28 Crim. Just. Rev. 355 (2003).

[14] *See* Philip M. Stinson, John Liederbach, Steven L. Brewer, Brooke E. Mathna, *Police Sexual Misconduct: A National Scale Study of Arrested Officers*, Crim. Just. Fac. Publ'n (2014).

[15] *Addressing Sexual Offenses and Misconduct by Law Enforcement: Executive Guide,* International Association of Chiefs of Police, June 2011, at 4 ("IACP"), https://www.theiacp.org/sites/default/files/all/a/AddressingSexualOffensesandMisc onductbyLawEnforcementExecutiveGuide.pdf. The International Association of Chiefs of Police is the world's largest and most influential professional association for police leaders with more than 33,000 members in over 170 countries. Since 1893, it has been "speaking out on behalf of law enforcement and advancing leadership and professionalism in policing worldwide." *About IACP*, https://www.theiacp.org/about-iacp.

direct supervision," "work late into the night when their conduct is less in the public eye," and "engage with vulnerable populations who lack power and are often perceived as less credible."[16]

Researchers have also concluded that, due to officers' power, authority, and discretion, "[p]olice work is conducive to sexual misconduct."[17] The U.S. Department of Justice ("DOJ") has also recognized that the nature of the profession can lead to sexual misconduct, noting in its report on the Baltimore City Police Department that officers there used their special power and authority to "coerce sexual favors . . . in exchange for avoiding arrest."[18]

Given that police sexual misconduct is enabled by the nature of police work, it is imperative for victims to have adequate remedies, such as holding the officer's law enforcement agency vicariously liable under principles of *respondeat superior*.

---

[16] *Id.*

[17] Stinson, *supra* note 14 at 2 (explaining that police have the opportunity to engage in sexual violence because they routinely operate alone at night and encounter vulnerable people); *see also* Martha Chamallas, *Vicarious Liability in Torts: The Sex Exception*, 48 Val.. U. L. Rev. 133, 171-72 (2013) (explaining that "there is a special risk that the cultural norm of deference will facilitate abuse" when police deal with vulnerable populations who are expected to defer to authority figures).

[18] U.S. Dep't of Just., Civ. Rights Div., *Investigation of the Baltimore City Police Department* 149 (Aug. 10, 2016), https://www.justice.gov/crt/file/883296/download.

Vicarious liability helps deter misconduct and diminish recurrence, because it "recognizes . . . that the ability to exercise control over employees' work-related conduct enables, and provides incentive for, the employer to take measures to reduce the incidence of tortious conduct." *Brenden*, 470 P.3d at 173 (cleaned up). For Indigenous women like L.B., pursuing justice and accountability through the FTCA for sexual assault by a federal officer can be challenging. Because of the limited scope of the U.S. government's waiver of sovereign immunity, other theories of vicarious liability, which would be available if the misconduct had been performed by a state or local police officer, are not available to L.B.—a "dichotomy" that this Court has recognized. *See L.B.*, 8 F.4th at 871.

The circumstances of policing—officers' vast power, authority, and discretion—all too often translate to greater opportunity to commit sexual assault, as it did in this case. The systemic nature of police sexual misconduct generally, and against Indigenous women specifically, demand institutional liability. Failing to account for the circumstances that facilitate police sexual misconduct coupled with difficulties of pursuing government liability for federal officers' abuse allows government agencies to avoid responsibility for their employee misconduct. This is not only a miscarriage of justice, but also leaves Indigenous women like L.B. defenseless.

2.    The U.S. government has neglected the rampant victimization of Indigenous women in Montana [19]

The U.S. government is obligated to protect Indigenous people under the federal Indian trust responsibility doctrine. This seminal doctrine, which arises from the treaties signed by the U.S. with Indian Tribes, is a legal obligation under which the U.S. "has charged itself with moral obligations of the highest responsibility and trust" toward Indian Tribes. *Seminole Nation v. United States*, 316 U.S. 286, 297 (1942). This obligation is subject to "the most exacting fiduciary standards." *Id*. The Supreme Court has repeatedly reaffirmed the government's responsibility. [20] *See*, *e.g.*, *United States v. Mitchell*, 463 U.S. 206, 225 (1983) (noting "the undisputed existence of a general trust relationship between the United States and the Indian people"); *Seminole Nation*, 316 U.S. at 296 ("[T]his Court has recognized the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people."). [21]

---

[19] For further discussion about the rampant rates of violence, including sexual violence, against Indigenous women and girls, *amici* respectfully refer this Court to the *amicus* brief of the National Indigenous Women's Resource Center.

[20] The Supreme Court has likewise long recognized and reaffirmed the unique status of tribes as political sovereigns. *See, e.g., Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014) ("[Tribes] remain separate sovereigns pre-existing the Constitution.") (cleaned up); *Haaland v. Brackeen*, 599 U.S. 255, 307 (2023) ("Indian Tribes remain independent sovereigns[.]") (Gorsuch, J., concurring).

[21] The BIA also has recognized the trust responsibility, highlighting on its official website that "the Supreme Court has used language suggesting that it entails *legal duties, moral obligations, and the fulfillment of understandings and expectations* that

Lawmakers also have considered what the doctrine means specifically for women, noting that "the unique legal relationship of the United States to Indian Tribes creates a Federal trust responsibility to assist tribal governments in safeguarding the lives of Indian women."[22]

In recent years, federal agencies have further emphasized the relationship between the trust obligation and the safety of Indigenous people. For example, the DOJ has called public safety on Indian reservations "a major focus of the Department" alongside its "trust responsibility to federally recognized Tribes," and assured that it "strives to work with Tribes to uphold and enhance public safety in Tribal communities."[23] The DOJ has also published in its victim and witness assistance guidelines that the U.S. government's trust responsibilities "requir[e] Department personnel who investigate, prosecute, and respond to crimes in Indian Country to make their best efforts to afford [American Indian and Alaska Native]

---

have arisen over the entire course of the relationship between the United States and the federally recognized tribes." U.S. Dep't of Interior, Indian Affairs, *Frequently Asked Questions*, https://www.bia.gov/frequently-asked-questions (emphasis added).

[22] Violence Against Women and Dep't of Justice Reauthorization Act. of 2005, Pub. L. No. 109-162, § 901, 119 Stat. 2960, 3078 (2006).

[23] U.S. Dep't of Just., *Indian Country Investigations and Prosecutions* 18 (2021), https://www.justice.gov/d9/2023-08/2021_-_indian_country_investigations_and_prosecutions_report.pdf.

victims the rights and services provided by law."[24]  In the mission statement for its Office of Justice Services, the BIA even declares that "[e]nsuring public safety and justice is arguably the most fundamental of government services provided in Tribal communities."[25]

Despite these assurances, the U.S. government has fallen short on its promises and obligations to Indigenous communities, and particularly to Indigenous women. More than four in five Indigenous adults have experienced violence, and over half of Indigenous women have experienced sexual violence.[26]  Overall, Indigenous women are two and a half times more likely to experience violent crimes, and at least two times more likely to be raped or sexually assaulted, than women of other ethnicities.[27]  As this Court knows, there is also a terrible crisis of missing and murdered Indigenous people.  In Montana, Indigenous people comprise

---

[24] U.S. Dep't of Just., The Attorney General Guidelines for Victim and Witness Assistance 37 (2022), https://www.justice.gov/media/1254671/dl?inline.

[25] U.S. Dep't of Interior, Indian Affairs, *Office of Justice Services*, https://www.bia.gov/bia/ojs.

[26] U.S. Dep't of Just., Nat'l Inst. of Just., *Violence Against American Indian and Alaska Native Women and Men* 1 (May 2023), https://www.ojp.gov/pdffiles1/nij/249815.pdf.

[27] *Reviewing the Trump Administration's Approach to the Missing and Murdered Indigenous Women* (*MMIW*) *Crisis* 15, H'g Before Subcomm. For Indigenous Peoples of the United States, H. Comm. On Natural Resources, 116th Cong., 1st Sess. (Sept. 11, 2019), https://www.congress.gov/116/chrg/CHRG-116hhrg37680/CHRG-116hhrg37680.pdf.

approximately 6.7% of the population, but were the subjects of 26% of the state's missing persons reports between 2016 and 2018.[28] Shockingly, it is estimated that rates of violence on reservations are nearly ten times higher than national averages.[29]

Principally for historical and jurisdictional reasons, the Federal Bureau of Investigation ("FBI") and BIA exercise most law enforcement functions on many reservations, including the Northern Cheyenne Reservation. Despite the clear public safety needs, federal law enforcement is frequently unresponsive and neglectful to the victims of violence on reservations. It can take days for BIA officers to respond to a call.[30] Reports are often not taken seriously and may not even be referred to the FBI for further investigation.[31] Indeed, L.B.'s Tribe is so dissatisfied with the law enforcement provided by the BIA that it sued the U.S. government to compel it to

---

[28] Sam Wilson, *Families, Investigators Struggle to Track Down Missing Native Women*, Billings Gazette (Feb. 25, 2019), https://billingsgazette.com/news/state-and-regional/mmiw/families-investigators-struggle-to-track-down-missing-native-women/article_3fee49c9-913a-593d-96e3-14d03a781caa.html.

[29] U.S. Dep't of Interior, Indian Affairs, *Missing and Murdered Indigenous People Crisis: Violence Against Native Americans and Alaska Natives far Exceed National Averages*, https://www.bia.gov/service/mmu/missing-and-murdered-indigenous-people-crisis.

[30] Laura Sullivan, *Rape Cases on Indian Lands Go Uninvestigated*, NPR (July 25, 2007), https://www.npr.org/templates/story/story.php?storyId=12203114.

[31] U.S. Dep't of Just., Office of Violence Against Women, *2016 Tribal Consultation Report* 62 (Dec. 2016), https://www.justice.gov/ovw/page/file/953291/download; Kathy Dobie, *Tiny Little Laws: A Plague of Sexual Violence in Indian Country*, Harpers Mag.. (Feb. 2011), https://harpers.org/archive/2011/02/tiny-little-laws/.

allow the Tribe to assume its own police responsibilities.[32]  Moreover, even when crimes are referred to federal prosecutors, they are often not pursued; between fiscal years 2005 and 2009, U.S. Attorney's Offices "declined to prosecute 67 percent of sexual abuse" matters in Indian Country.[33]  As one tribal public defender described, "rape kits never come back . . .  They will not prosecute, yet they won't send the information down so the [T]ribe can prosecute.  We never, ever see the results of a rape kit."[34]  A tribal judge described the FBI as a "black hole."[35]  Moreover, sexual assault in Native communities is vastly underreported,[36] just as it is nationally.[37]

The fact that many BIA officers are known by Indigenous communities to be perpetrators of or complicit in violence against women, and that their crimes are seldom punished, destroys faith in law enforcement.  ACLU affiliates such as

---

[32] Complaint ¶¶ 1-4, 56-58, *Northern Cheyenne Tribe v. United States,* No. 20-cv-183-BLG-SPW (D. Mont. Dec. 15, 2020) (ECF 1).

[33] U.S. Gov't Accountability Office, GAO-11-167R, *U.S. Department of Justice Declinations of Indian Country Criminal Matters* 9 (Dec. 2010), https://www.gao.gov/assets/gao-11-167r.pdf.

[34] Dobie, *supra* note 31.

[35] *Id.*

[36] U.S. Dep't of Just., Office on Violence Against Women, 2017 Tribal Consultation Report 74 (Oct. 2017), https://www.justice.gov/ovw/file/1046426/download.

[37] Rachel E. Morgan & Grace Kena, U.S. Dep't of Just. Bulletin, *Criminal Victimization, 2016:  Revised* 7 (2018) (estimating just 23.2% of rapes and sexual assaults were reported in 2016), https://bjs.ojp.gov/content/pub/pdf/cv16.pdf.

ACLU-MT have repeatedly heard from Indigenous advocates that tribal members avoid contact with law enforcement because every interaction presents an opportunity for officers to abuse their authority against citizens.[38] Even the Montana Legislature has acknowledged this problem. In 2019, citing the specific example of Bullcoming's abuse of L.B., the Montana Legislature recognized the "extreme power imbalance between" a police officer and people being policed.[39] As a result of this recognition, the Montana Legislature enacted Senate Bill 261 into law, amending § 45-5-501, MCA, to include a provision that a "victim is incapable of consent" when the victim is "a witness in a criminal investigation or a person who is under investigation in a criminal matter and the perpetrator is a law enforcement officer who is involved with the case in which the victim is a witness or is being investigated." *See* § 45-5-501(1)(b)(xi), MCA.

The BIA's dysfunctional culture is further evidenced by data concerning the treatment of its own employees. Among all of the agencies within the Department

---

[38] *See, e.g., Trottier v. United States*, No. 21-CV-93, 2021 WL 5237287 (D.N.D. Nov. 10, 2021) (plaintiff was sexually assaulted by a BIA corrections officer while confined at Standing Indian Reservation Juvenile Detention Center).

[39] *See* Senator Diane Sands' introduction of SB261 at the Senate Judiciary Committee hearing on SB 261, 2019 Leg., 66th Sess. (Feb. 21, 2019), http://sg001-harmony.sliq.net/00309/Harmony/en/PowerBrowser/PowerBrowserV2/20190221/-1/33819 at 9:36:30, 9:37:10. SB261 passed the House of Representatives 96-2 and the Senate 46-4 before being signed into law.

of the Interior, the BIA has the highest rate of employees (40.2%) who were harassed in the workplace.[40]   The BIA also has one of the highest rates for specific types of harassment, including sexual harassment and sexual assault in the workplace.[41]

> 3.   Imposing vicarious liability on law enforcement agencies whose officers commit sexual assault will foster institutional accountability

Finding that law enforcement officers act within the scope of their employment when they leverage their authority and power to commit sexual assault will bring much-needed accountability to the federal agencies that police Indian reservations.  It will also hasten the U.S. government's fulfillment of its obligations to Indigenous people under the Indian trust responsibility doctrine.

Sexual misconduct by police does not occur because of a few "bad apples." Rather, it is the result of a lack of direct supervision, isolated contact with the public, a male-dominated culture, and a culture of secrecy, which all create an atmosphere ripe for police to abuse their authority.[42]   There is a "culture of allegiance and

---

[40] U.S. Dep't of Interior, Work Place Environment Study Reports, *Topline Results,* https://www.doi.gov/sites/doi.gov/files/uploads/doi_wes_topline_results_summary .pdf.

[41] *Id.*

[42] Cara E. Trombadore, *Police Officer Sexual Misconduct: An Urgent Call to Action In a Context Disproportionately Threatening Women of Color*, 32 Harv. J. Racial & Ethnic Just. 153, 164-65 (2016); IACP, *supra* note 15 at 4; Timothy M. Maher, *Police Chiefs' Views on Police Sexual Misconduct*, 9 Police Prac. & Res. 239, 241 (2008).

loyalty" within the profession that can "result in situations where unprofessional and even illegal behavior is tolerated out of a misplaced sense of loyalty."[43]

To incentivize institutional change, civil liability should be assessed at the governmental level. The prospect of liability can encourage valuable prophylactic steps: adopting more rigorous hiring criteria; improving training and education; collecting and analyzing data on individual officers; implementing reporting systems; and swiftly investigating allegations of misconduct.[44] Imposing vicarious liability on a police agency not only vindicates an individual plaintiff's rights, but also deters future misconduct on an agency-wide level and safeguards the rights of others.

Law enforcement agencies within state and local governments consider potential civil liability when making policy decisions. The federal agencies that police Indian reservations should be pushed to consider potential civil liability, as well. For example, in the state of Texas, 62% of police chiefs reported that the possibility of a lawsuit was a "moderate or major consideration when making decisions affecting the general public," 93% stated that their officers received training on legal liabilities, 13% identified a policy affecting the public that they

---

[43] IACP, *supra* note 15 at 5.

[44] *Id*. at 7-12 (recommending such measures to reduce police sexual misconduct). *See also* Brenden, 470 P.3d at 172-73.

changed because of litigation or fear of litigation, and 14% identified a policy affecting their officers that changed from a lawsuit or fear of being sued.[45]

Officials in some of the country's largest cities look to claims of police misconduct as guides for police reform "with the goal of reducing incidents that can spur potentially costly lawsuits."[46] Chicago looks at data to identify the causes of claims and modify police policies and procedures.[47] Houston similarly looks at claims data to determine the conduct that has led to settlements both in Houston and nationwide, with the police chiefs recognizing that "[t]here's consequences to these payouts."[48] Los Angeles County develops corrective action plans after expensive settlements "to reduce the likelihood a similar situation will happen again."[49] The New York City Police Department even collaborates with the city's Law Department

---

[45] Michael S. Vaughn, Tab W. Cooper, Rolando V. del Carmen, *Assessing Legal Liabilities in Law Enforcement: Police Chiefs' Views*, 47 Crime & Delinquency 3, 18-19 (2001).

[46] Scott Calvert & Dan Frosch*, Police Rethink Policies as Cities Pay Millions to Settle Misconduct Claims*, Wall Street Journal (Oct. 22, 2020), https://www.wsj.com/articles/police-rethink-policies-as-cities-pay-millions-to-settle-misconduct-claims-11603368002.

[47] *Id.*

[48] *Id.*

[49] *Id.*

in improving training and policies.[50]   Based on claims data, the New York City Comptroller's Office also recommended in a 2023 report that "[t]he NYPD should take additional steps to reduce misconduct claims, including by incorporating information on claims against officers into its accountability framework and adopting additional policies and trainings designed to reduce misconduct."[51]

Exposure to civil liability has been spurring necessary change in state and city law enforcement agencies across the country.  Those living on Indian reservations should also benefit from this kind of safeguard where federal agencies—not local or state—largely provide law enforcement services.

## CONCLUSION

*Amici* respectfully request that this Court reverse the district court's grant of summary judgment to the U.S. government, and direct that summary judgment be entered in favor of L.B.

---

[50] *Id.*

[51] New York City Comptroller, *Annual Claims Report Fiscal Year 2022* 29 (April 14, 2023), https://comptroller.nyc.gov/wp-content/uploads/documents/Annual-Claims-Report-FY2022.pdf.

Respectfully submitted this 27th day of November 2023.

By: */s/ Alex H. Rate*
Alex H. Rate
Marthe Y. VanSickle
ACLU of Montana Foundation, Inc.
P.O. Box 1968
Missoula, MT 59806
ratea@aclumontana.org
vansicklem@aclumontana.org

By: */s/ Jeffrey L. Braun*
Jeffrey L. Braun
Danielle Moody*
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
jbraun@kramerlevin.com
dmoody@kramerlevin.com

Chloe Bootstaylor
Kramer Levin Naftalis & Frankel LLP
2000 K Street NW, 4th Floor
Washington, DC 20006
cbootstaylor@kramerlevin.com
*Counsel for Amici Curiae*

By: */s/ Linda S. Morris*
Linda S. Morris
American Civil Liberties Union
125 Broad Street
New York, NY 10004
LindaM1@aclu.org

Crystal Pardue*
Rachel Meeropol
ACLU Racial Justice Program
125 Broad Street
New York, NY 10004
cpardue@aclu.org
rmeeropol@aclu.org

* Application for admission pending

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

Instructions for this form: *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 23-35538

I am the attorney or self-represented party.

**This brief contains** 5,289 **words,** including _____ words manually

counted in any visual images, and excluding the items exempted by FRAP 32(f).

The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one):*

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ **X** ]  is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir.
R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because
*(select only one):*
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.
[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _/s/ Alex H. Rate_____ **Date** ___11/27/2023____
*(use "*s/[typed name]*" to sign electronically-filed documents)*

- 31 -

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 27, 2023.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Alex H. Rate*